USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/30/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Uriel Vazquez Perez,
on his own behalf and on behalf of others similarly
situated,

              Petitioner-Plaintiff,

    –v–

Thomas Decker, *et al.*,

              Respondents-Defendants.

---

18-cv-10683 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Petitioner-Plaintiff Uriel Vazquez Perez brings this class petition for habeas corpus relief

and class complaint against Respondents-Defendants Thomas Decker, in his official capacity as

New York Field Office Director for U.S. Immigration and Customs Enforcement, and others,

alleging that ICE's practice of failing to provide prompt initial appearances before an

Immigration Judge violates the Constitution, as well as the Administrative Procedure Act.[1]  Now

before the Court is Vazquez Perez's unopposed motion to certify a class of all individuals who

have been, or will be, arrested by ICE's New York Field Office and detained under Section 1226

of Title 8 of the United States Code for removal proceedings and who have not been provided an

initial hearing before an Immigration Judge, as well as the parties' cross-motions for summary

judgment.  For the reasons set forth below, Vazquez Perez's motion for class certification is

---

[1] Vazquez Perez's class petition and complaint, filed on November 15, 2018, advanced claims related to (1)
violations of Procedural Due Process; (2) violations of Substantive Due Process; (3) violations of the Fourth
Amendment; (4) violations of the APA related to presentment delays; and (5) violation of the APA related to ICE's
failure to exercise required individualized discretion in its bond determinations.  However, he has agreed to
withdraw without prejudice the third and fifth of these claims.  *See* Dkt. No. 127.  Accordingly, only the first,
second, and fourth of these claims is now before the Court.  *See* Dkt. No. 133 at 2 n.3.

GRANTED, his motion for summary judgment is GRANTED in part and DENIED in part, and

the Government's cross-motion for summary judgment is GRANTED in part and DENIED in

part.

## I.   BACKGROUND

### A.  Procedural Background

On November 15, 2018, Vasquez Perez filed a class petition for a writ of habeas corpus

and class complaint for declaratory and injunctive relief.  Dkt. No. 1.  At the same time, he also

filed a motion to certify a class of "[a]ll individuals who are, have been, or will be arrested by

ICE's [New York Field Office] and detained under 8 U.S.C. § 1226 for removal proceedings

before an immigration judge, and who have not been provided an initial hearing before an

immigration judge." Dkt. Nos. 3–4.

On December 5, 2018, before the Government responded to either the class petition/

complaint or the class certification motion, Vazquez Perez filed a motion for preliminary

injunctive and declaratory relief.  Dkt. No. 3.  On September 30, 2019, the Court conditionally

certified the putative class, *see* Dkt. No. 124 at 8, and denied the motion for preliminary

injunctive and declaratory relief, concluding that 8 U.S.C. § 1252(f)(l) stripped it of jurisdiction

to issue classwide injunctive relief, *see id.* at 9–17, and it could not grant *preliminary* declaratory

relief because such relief does not exist, *id.* at 17–22.  At the same time, the Court concluded that

8 U.S.C. § 1252(f)(1) does not strip it of jurisdiction to issue final declaratory relief on a

classwide basis.  Dkt. No. 124 at 17–19.

In the Court's September 30, 2019 Opinion and Order, the Court ordered the Government

to comply with certain reporting requirements, including notifying the Court if any individuals

have waited longer than 17 days between the filing of the notice to appear, the charging

document that initiates removal proceedings, and the initial hearing before an Immigration Judge and continuing to provide monthly updates on data regarding median wait times between arrest and scheduling of initial hearings. *Id.* at 23.  The Court further ordered the parties to meet and confer and submit a proposal for the next procedural steps in this matter.  *See id.*

The parties proposed submitting simultaneous supplemental briefing and requested that the Court convert their prior submissions on the motion for preliminary injunctive and declaratory relief, together with their supplemental briefing, into cross-motions for summary judgment and deem the motions fully submitted.  *See* Dkt. No. 127.  The Court adopted this request, *see* Dkt. No. 128, and on November 1, 2019, the parties filed their supplemental briefing.  *See* Dkt. Nos. 133–135.  Accordingly, the parties' cross-motions for summary judgment are now fully submitted.

### B.  Factual Background

The Court assumes familiarity with the pertinent facts of this case—which are undisputed unless otherwise noted—as set out in its September 30, 2019 Opinion and Order.  *See* Dkt. No. 124.  The Court revisits that factual background here as necessary and sets out further development of the record since the September 30 Opinion and Order.

The immigration laws authorize Immigration and Customs Enforcement to charge individuals as removable, arrest individuals subject to removal, and then detain them pending removal proceedings.  *See Demore v. Kim*, 538 U.S. 510, 523–26 (2003).  As relevant here, 8 U.S.C. § 1226 authorizes detention of any individual in removal proceedings and requires detention in some cases.  *See* 8 U.S.C. §§ 1226(a), (c).  Following arrest, ICE officers may release an individual detained pursuant to § 1226(a) if she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that [she] is

likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). Determinations on removability and custody are made by ICE and recorded in the Notice to Appear.

Individuals who are arrested by ICE's New York Field Office and detained are placed in civil removal proceedings at the New York City Immigration Court at 201 Varick Street in Manhattan. Dkt. No. 59-1 ¶ 23; Dkt. No. 67 ¶ 16. The Immigration Court obtains jurisdiction over removal proceedings when an ICE officer files the NTA. 8 C.F.R. § 1003.14(a). While awaiting their initial appearance before the Immigration Judge, individuals are detained in criminal jails pursuant to a contract with ICE to house immigration detainees. Dkt. No. 59-1 ¶ 8.

The initial appearance, also known as the initial master calendar hearing, is the first substantive step in the removal proceedings. The initial master calendar hearing is typically an individual's first opportunity to appear before an Immigration Judge. In order to permit individuals to secure counsel before their initial master calendar hearing, 8 U.S.C. § 1229 provides that the initial master calendar hearing may not be scheduled earlier than 10 days after service of the notice to appear unless the individual requests in writing an earlier hearing date. *See* 8 U.S.C. § 1229(b)(1). The Government does not dispute that most detainees waive the 10-day waiting period this Section provides. *See* Dkt. No. 59-1 ¶ 7.

In addition to all of the procedural protections provided by Immigration Judges at the initial master calendar hearing, *see* Dkt. No. 124 at 3–4, these hearings are also typically the first opportunity for indigent individuals to seek pro bono legal representation, Dkt. No. 53-1 ¶ 10, and for the Immigration Judge to review ICE's custody determinations and possibly release eligible individuals on bond, Dkt. No. 53-3 ¶¶ 13–14; Dkt. No. 53-1 ¶¶ 20, 22; Dkt. No. 67 ¶ 15. Though, as discussed above, ICE makes an initial custody determination following arrest, Vazquez Perez presents uncontradicted evidence that, from 2016 until at least November 2018,

ICE's New York Field Office operated under a "no bond" policy and issued bond in none of its cases.  Dkt. No. 59-1 ¶ 14.

The parties agree that there have been significant delays between an individual's arrest and the initial master calendar hearing over the last few years.  In 2014, the median wait time between arrest and initial master calendar hearing was 11 days, Dkt. No. 59-7 ¶ 5(a), but by 2017, the median wait time had increased to 42 days, *id.* ¶ 5(d).  In April 2018, median wait times increased precipitously, and, as demonstrated in the table below, this increase accelerated in the spring and summer of 2018.

| Month | Median Wait Time | 25th Percentile Wait Time | 75th Percentile Wait Time |
|---|---|---|---|
| April 2018 | 58 | 45 | 64 |
| May 2018 | 61.5 | 34 | 74 |
| June 2018 | 75 | 54 | 88 |
| July 2018 | 80 | 42 | 96 |
| August 2018 | 85 | 72 | 97.5 |
| September 2018 | 83 | 71 | 98 |

Dkt. No. 59-7 ¶ 5 (h)–(m).  Vazquez Perez presents evidence that for initial master calendar hearings that took place between August and October 2018, wait times were over two months in 86% of cases and over three months in 38%.  *See id.* ¶ 6.  The Government attributes these delays to "a steadily increasing caseload over the past few years, a lack of resources to face the increased demands, and management and staffing challenges."  Dkt. No. 71 at 14.

In August 2018, however, the Executive Office for Immigration Review, which oversees the Immigration Courts, began taking measures to address these ballooning wait times, including, among others, improving case tracking efforts, moving initial master calendar

hearings to the mornings to allow for more time to complete them, and adding new courtrooms and judges.  *See generally* Dkt. No. 71 at 15–21.  It also put into place a 21-day policy, calling for all initial master calendar hearings to be held within 21 days of the Immigration Court's receipt of the NTA, *see* Dkt. No. 67 ¶ 34, which was reduced to a 17-day policy in early 2019, *see id.* ¶ 45–46; Dkt. No. 85-1 ¶ 7.

The Government offers evidence that, in response to these measures, wait times between filing of the NTA and initial master calendar hearing began trending down in October 2018 and decreased substantially from February 2019 until issuance of the Court's September 30, 2019 Opinion and Order.

| Month | Median Wait Time | 25th Percentile Wait Time | 75th Percentile Wait Time |
|---|---|---|---|
| October 2018 | 58[2] | 43 | 70 |
| November 2018 | 50 | 34 | 69 |
| December 2018 | 47 | 27 | 62 |
| January 2019 | 31 | 16 | 49 |
| February 2019 | 14 | 12 | 16 |
| March 2019 | 10 | 8 | 11 |
| April 2019 | 17 | 13 | 19 |
| May 2019 | 18 | 11 | 24 |
| June 2019 | 11 | 9 | 15 |
| July 2019 | 12 | 9 | 15 |
| August 2019 | 8 | 6 | 12 |

---

[2] Vazquez Perez presents evidence that the median wait time between *arrest* and initial master calendar hearing in October 2018 was 81 days.  *See* Dkt. No. 59-7 ¶ 5(n).

| September 2019 | 13 | 10 | 16 |

Dkt. No. 130-1 ¶ 8.  Nonetheless, between April and September 2019, 108 detained individuals received initial master calendar hearings more than 17 days after filing of the NTA.  *See* Dkt. No. 130-1 ¶ 7.  And these wait times do not reflect the time between *arrest* and filing of the NTA, which the Government's data, where available, indicates averaged between two and three days during this period.  *See* Dkt. No. 89 ¶ 3; Dkt. No. 116-1 ¶¶ 2–4; Dkt. No. 129-1 ¶ 5.

For initial master calendar hearings held between October 2019 and February 2020, the median wait time between the filing of the NTA and initial master calendar hearing hovered between 13 and 14 days, with 25th percentile wait times and 75th percentile wait times ranging between 10–12 and 14–16 days respectively.

| Month | Median Wait Time | 25th Percentile Wait Time | 75th Percentile Wait Time |
|---|---|---|---|
| October 2019 | 13 | 10 | 14 |
| November 2019 | 13 | 10 | 15 |
| December 2019 | 14 | 10 | 14 |
| January 2020 | 13 | 12 | 16.5 |
| February 2020 | 13 | 12 | 14 |

*See* Dkt. No. 137-2 ¶ 5; Dkt. No. 138-2 ¶ 5; Dkt. No. 142-2 ¶ 5; Dkt. No. 147-2 ¶ 5; Dkt. No. 148-2 ¶ 5.  During these months, 24 detained individuals did not receive initial master calendar hearings within 17 days of filing of the NTA, *see* Dkt. No. 143-1 ¶ 7 & n.5; Dkt. No. 147-2 ¶ 6; Dkt. No. 148-2 ¶ 6, and the average time between arrest and filing of the NTA remained around two to three days, *see* Dkt. No. 137-2 ¶ 3; Dkt. No. 138-2 ¶ 3; Dkt. No. 142-2 ¶ 5; Dkt. No. 147-2 ¶ 5; Dkt. No. 148-2 ¶ 5.

This relatively steady trend was destabilized in March 2020 by the COVID-19 pandemic. The unprecedented nature of this global pandemic impacted the Varick Street Immigration Court in numerous ways.  As a result of the pandemic, the Varick Street was forced to operate with less than half of its staff; contend with an increase in the number of district court-ordered bond hearings within short time frames; and temporarily close for a period of time on March 24, 2020. *See* Dkt. No. 149-2 ¶ 7–8.  Though wait times in March remained steady for detained individuals who received initial master calendar hearings during that month, *see* Dkt. No. 149-2 ¶ 5; Dkt. No. 149-1 ¶ 3, The Government reports that several initial master calendar hearings scheduled for March had to be rescheduled outside the 17-day time frame due to court closures and delays in processing NTAs, *see* Dkt. No. 149-2 ¶ 7–9 (listing 8 detained individuals who did not receive initial master calendar hearings as scheduled for March).  As noted below, median wait times between filing of the NTA and initial master calendar hearing ballooned in April and May 2020 to 36 and 50 days respectively due to disruptions caused by COVID-19.  *See* Dkt. No. 153-2 ¶¶ 6–7; Dkt. No. 154-2 ¶¶ 6–7.

| Month | Median Wait Time | 25th Percentile Wait Time | 75th Percentile Wait Time |
|---|---|---|---|
| March 2020 | 13 | 11 | 13 |
| April 2020 | 36 | 28 | 42 |
| May 2020 | 50 | 45 | 55 |
| June 2020 | 8 | 8 | 9 |
| July 2020 | 10 | 10 | 10 |
| August 2020 | 10 | 7 | 11 |
| September 2020 | 8 | 7 | 9 |

| October 2020 | 7 | 7 | 10 |

*See* Dkt. No. 149-2 ¶ 5; Dkt. No. 153-2 ¶ 5; Dkt. No. 154-2 ¶ 5; Dkt. No. 155-2 ¶ 5; Dkt. No. 156-2 ¶ 4; Dkt. No. 157-2 ¶ 4; Dkt. No. 158-2 ¶ 4; Dkt. No. 159-2 ¶ 8.

In their April and May reporting to the Court, the Government also identified several additional detained individuals who did not receive initial master calendar hearings within 17 days of filing of the NTA as a result of issues caused by the COVID-19 pandemic, *see* Dkt. No. 150 (identifying two such individuals); Dkt. No. 151 (identifying 11 such individuals); Dkt. No. 152 (identifying one such individual); Dkt. No. 153-2 ¶ 8 (identifying eight such individuals); Dkt. No. 154-2 ¶ 8 (identifying two such individuals).

Throughout the spring of 2020, the Government consistently represented to the Court that the Varick Street Immigration Court was taking measures to respond to challenges posed by the COVID-19 pandemic and believed it would be able to meet the 17-day time frame again in cases going forward. *See* Dkt. No. 149-2 ¶ 8 (making this representation in April); Dkt. No. 153-2 ¶ 7 (making this representation in May); Dkt. No. 154-2 ¶ 7 (making this representation in June). The fruits of these efforts were realized in June and July 2020, when wait times approximated the lowest levels of the prior year and zero and one detained individuals respectively received initial master calendar hearings outside the 17-day timeframe. *See* Dkt. No. 155-2 ¶ 4; Dkt. No. 156-2 ¶ 5.

## II.    MOOTNESS

The Court first addresses the threshold question of whether the claims asserted by Vazquez Perez are moot. The Government argues that because it has generally succeeded in decreasing wait times before a detained individual receives an initial master calendar hearing, Vazquez Perez's claims are moot. *See* Dkt. No. 135 at 2–4. The Court disagrees.

The burden of showing mootness "logically falls on a defendant because, 'by the time mootness is an issue, the case has been brought and litigated, often . . . for years. To abandon the case at an advanced stage may prove more wasteful than frugal.'" *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 191–92 (2000). Where, as here, a party claims that its voluntary compliance with the law moots a case, it must "demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange,* 303 F.3d 450, 451 (2d Cir. 2002)). The burden of demonstrating mootness under such circumstances is both "stringent" and "formidable." *Id.* at 604.

Here, the Government has failed to satisfy either prong of this test. First, it has not demonstrated that "it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt.*, 819 F.3d 581, 603–04 (2d Cir. 2016) (citation omitted). Though the Government represents that it has now instituted a policy requiring initial master calendar hearings within 17 days of filing of the NTA, Dkt. No. 67 ¶ 6, 45–46; Dkt. No. 85-1 ¶ 7, it is free to abandon that policy at any time. Indeed, "[c]ourts are . . . skeptical as to whether remediations effectuated through policy, or prospective promises generally, are unlikely to recur, because a policy may be rescinded and a prohibited practice may be reinstituted on short notice." *See Thomas v. West*, No. 14-CV-4459 (LTS), 2018 WL 3768525, at *4 (S.D.N.Y. Aug. 8, 2018). And even under this policy, though the Government has decreased *median* wait times, between April 2019 and February 2020, 132 detained individuals still received initial master calendar hearings more than 17 days after filing of the NTA. *See* Dkt. No. 130-1 ¶ 7; Dkt. No. 143-1 ¶ 7

& n.5; Dkt. No. 147-2 ¶ 6; Dkt. No. 148-2 ¶ 6. (When delays precipitated by the COVID-19 pandemic are factored in, this number grows to over 160 detained individuals.) Thus, even by the Government's own standards, "[t]here is no mere *risk* that [the Government] will repeat its allegedly wrongful conduct; it has already done so." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993) (emphasis added).

Second, the Government has failed to demonstrate that it has "completely" eradicated alleged violations, nor could it do so on the record now before the Court. As explained in greater detail below, *see infra* Section IV.B, even if the Government had successfully and uniformly implemented its policy of providing initial master calendar hearings within 17 days of filing of the NTA—which it has not, due to factors both within and without its control—such a policy and practice would nonetheless be unconstitutional. And "a plaintiff's claims will not be found moot where the defendant's [corrective action] suffers from similar infirmities as it did at the outset." *Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 378 (2d Cir. 2004).

Accordingly, the Court concludes that the Government has failed to satisfy the "stringent" and "formidable" burden of demonstrating mootness.

## III.   CLASS CERTIFICATION

The Court next addresses Vazquez Perez's motion for class certification. Vazquez Perez filed that motion on November 15, 2018. The Government had yet to respond to that motion by the time of oral argument on the motion for preliminary injunctive and declaratory relief, which was held on April 8, 2019. Consequently, at that argument, the Court directed counsel for the Government to confer with counsel for Vazquez Perez regarding briefing on the motion for class certification. *See* Dkt. No. 96 at 67, 83. The Court advised the parties that "in the absence of a

11

stipulation" to conditional or preliminary certification of the class, it would "need briefing" on the motion. Dkt. No. 96 at 83. As of the date of the Court's Opinion and Order on the motion for preliminary injunctive or declaratory relief, the Court had still not received any briefing from the Government on the class certification motion. It thus construed the decision not to file an opposition as a stipulation to the conditional certification of the putative class for purposes of the motion for preliminary injunctive or declaratory relief. *See* Dkt. No. 124 at 8.

As discussed above, following issuance of the Court's September 30, 2019 Opinion and Order and at the parties' request, the Court converted the parties' prior submissions on the motion for preliminary injunctive or declaratory relief, together with their supplemental briefing, into cross-motions for summary judgment. In his supplemental memorandum of law submitted in support of his motion for summary judgment, Vazquez Perez pointed out that, as of the time of filing, the Government had still not responded to his motion for class certification. *See* Dkt. No. 133 at 1 n.1. And as of the date of this Opinion and Order—two years from the filing of Vazquez Perez's class certification motion—that motion remains unopposed. Indeed, the Government does not address the question of class certification in any way in its supplemental memorandum in support of its motion for summary judgment and have not addressed it in any way since.

"[I]t is difficult" for this Court "to imagine [a] case[] in which it is appropriate to defer class certification until after decision on the merits," *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000) (citation omitted), and, even if such a case exists, this case is not it. Accordingly, in light of the Government's failure to respond to the class certification motion for nearly two years despite being on notice that any opposition would require further briefing, the Court now deems Vazquez Perez's motion unopposed. In light of

12

this history, the Court construes the Government's failure to oppose class certification as a stipulation to certification.  Nevertheless, the Court proceeds to consider the question on its merits.  *See In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *6 (S.D.N.Y. Aug. 13, 2020) ("[T]he Court has an independent obligation to ensure that the standards for class certification are met . . . ."); *Douglin v. GreatBanc Tr. Co.*, 115 F. Supp. 3d 404, 409 (S.D.N.Y. 2015) ("Even when unopposed, a motion for class certification must be evaluated on its merits.").

For the reasons that follow, this motion is GRANTED.

**A.  Standard**

Vazquez Perez seeks to certify the following class:  all individuals who have been, or will be, arrested by ICE's New York Field Office and detained under Section 1226 of Title 8 of the United States Code for removal proceedings before an immigration judge and who have not been provided an initial hearing before an immigration judge.  *See* Dkt. No. 4 at 1.

As an initial matter, the Court must determine what standard governs class certification in this case.  The operative pleading in this matter is a class petition for a writ of habeas corpus *and* class complaint for declaratory and injunctive relief.  *See* Dkt. No. 1.  Vazquez Perez argues that the proposed class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and qualifies as a representative habeas class pursuant to the Second Circuit's decision in *United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir. 1974).  In *Preiser*, the Second Circuit concluded that, under certain circumstances, "multi-party proceeding[s] similar to the class action authorized by the [Federal] Rules of Civil Procedure" may be allowed.  *See id.* at 1125. Though "the precise provisions of Rule 23 are not applicable" to such proceedings, the Second Circuit engaged in a Rule 23 analysis before concluding that an "analogous procedure" was

13

appropriate in *Preiser*. *Id.* at 1126.  Since *Preiser*, several courts in this Circuit have likewise

employed a Rule 23 analysis in determining whether certification of a habeas class is warranted.

*See, e.g.*, *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 609, 614–17 (S.D.N.Y. 2018) (applying Rule 23

where, as here, Plaintiffs sought injunctive, declaratory, and habeas relief); *Abdi v. Duke*, 323

F.R.D. 131, 136 (W.D.N.Y. 2017) ("Courts that have proceeded with class claims in habeas

cases have applied the Rule 23 requirements in determining whether to certify the multiparty

action.") (collecting cases).  Accordingly, the Court will measure the proposed class—whether it

be construed as a Rule 23 or a habeas class[3]—against the Rule 23 standard for certification of

class actions.

In order to qualify for class certification, a plaintiff must first demonstrate that the class it

proposes satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a).  Those

requirements are:

> (1)     the class is so numerous that joinder of all members is impracticable;
> (2)     there are questions of law or fact common to the class;
> (3)     the claims or defenses of the representative parties are typical of the claims or
>         defenses of the class; and
> (4)     the representative parties will fairly and adequately protect the interests of the
>         class.

Fed. R. Civ. P. 23(a).  These "four requirements—numerosity, commonality, typicality, and

adequate representation —effectively limit the class claims to those fairly encompassed by the

named plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation

and internal quotation marks omitted).  "A class may be certified only if, 'after a rigorous

analysis,' the . . . court is satisfied that the prerequisites of [Rule 23(a)] are met."  *Roach v. T.L.*

---

[3] Because the parties opted to brief summary judgment rather than seek resolution of the petition, *see* Dkt. No. 127, it may be more accurate to characterize the class as a Rule 23 rather than a habeas class.

*Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

Assuming the requirements of Rule 23(a) are met, a plaintiff must then establish that certification is appropriate for one of the three reasons set forth in Rule 23(b).  Here, Vazquez Perez seek certification under Rule 23(b)(2), which authorizes class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met."  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").  Accordingly, although a Rule 23 inquiry should not "extend into a protracted mini-trial of substantial portions of the underlying litigation," the "district judge must receive enough evidence, by affidavits, documents, or testimony," including expert evidence as appropriate, to "be satisfied" that the necessary elements of class certification have been established.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

### B.  Rule 23(a)

In determining whether each of Rule 23's requirements have been met, the Court first assesses whether Vazquez Perez has met his burden to establish that the requirements of Rule 23(a) are met.

### 1. Numerosity

With respect to the first requirement, the Court is satisfied that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also Basso v. New York Univ.*, 363 F. Supp. 3d 413, 421 (S.D.N.Y. 2019). Vazquez Perez has demonstrated that the New York Field Office arrests over 1,000 individuals annually who are subsequently placed in proceedings before the Varick Street Immigration Court. *See* Dkt. No. 5-1 ¶ 5. Furthermore, Brooklyn Defender Services, which represents only one-third of individuals receiving *pro bono* legal services through the New York Immigrant Family Unity Project at Varick Street, has 80–100 detained clients with cases there at any given time—a population of sufficient size to satisfy the numerosity requirement on its own. Dkt. No. 5-2 ¶ 4, 9. Because Vazquez Perez has proffered evidence demonstrating that the proposed class comprises well over 40 members, the Court concludes that the numerosity requirement is satisfied.

### 2. Commonality

The Court is also satisfied that the commonality requirement is met because "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 350 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, the claims must "depend on a common contention," that is "of such a nature that it is capable of classwide resolution"—meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The

commonality requirement is met if "even a single question of law or fact [is] common to the members of the class." *Dukes*, 564 U.S. at 369.

Courts have routinely found the Rule 23(a) commonality requirement satisfied where, as here, the injuries of a putative class arise from a "unitary course of conduct" or "single policy of defendants," especially where defendants are government entities. *See Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010); *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *see also, e.g.*, *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 419 (S.D.N.Y. 2012).

Here, Vazquez Perez alleges that all putative class members' injuries arise from a common set of ICE procedures, chief among them the procedures governing the scheduling of initial master calendar hearings. Several common questions of law or fact emerge from this common set of procedures and apply equally to all proposed class members, including: "whether the government's policy and practice of failing to promptly provide class members with access to an IJ violates the Due Process Clause . . .and . . . whether the government's policy and practice of unreasonably delaying the first appearance of class members before a judge violates the Administrative Procedure Act." Dkt. No. 4 at 14. These common questions are apt to "generate common answers" likely "to drive resolution of the litigation." *Dukes*, 564 U.S. at 350. Indeed, determining whether ICE's policy and practice of delaying initial master calendar hearings is unconstitutional or in violation of the Administrative Procedure Act would resolve the issue "that is central to the validity of each one of the claims [of putative class members] *in one stroke*." *Id.* (emphasis added). The Court thus concludes that the commonality requirement is met.

### 3. Typicality

17

Vazquez Perez has also met his burden to establish that the typicality requirement is met. Typicality is satisfied where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). In practice, the "commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 350 n.5. Thus, Vazquez Perez meets the typicality requirement "for many of the same reasons [he] meet[s] the commonality requirement." *Sykes*, 285 F.R.D. at 291.

The typicality requirement is generally satisfied where the "same allegedly unlawful conduct was directed at or affected" the named plaintiff and the other members of the class, *Toney-Dick v. Doar*, No. 12-CV-9162 (KBF), 2013 WL 5295221, at *7 (S.D.N.Y. Sept. 16, 2013), especially where, as discussed above, the injuries alleged "derive from a unitary course of conduct by a single system," *Marisol A.*, 126 F.3d at 377. ICE's alleged policies and practices amount to a unitary course of conduct directed at all putative class members and from which all putative class members' alleged injuries derive. Accordingly, the Court finds the typicality requirement satisfied.

### 4. Adequacy

With respect to the final requirement, the Court is satisfied that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine whether the adequacy requirement is met, this Court must inquire "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). In this case, there is no evidence of conflict

between Vazquez Perez's interests and those of other members of the class.  Indeed, Vazquez

Perez is vigorously pursuing the claims of putative class members, which overlap in their

entirety with his own claims for relief.  *See* Dkt. No. 5-8.  Furthermore, there is considerable

evidence that Vazquez Perez's counsel—the New York Civil Liberties Union, the Bronx

Defenders, and the Immigration Justice Clinic at Cardozo School of Law—are qualified,

experienced, and able to conduct this litigation.  They have experience in federal civil rights

litigation, including challenging the unlawful detention of immigrants, and deep knowledge of

constitutional and immigration law.  *See* Dkt. No. 5-9 ¶ 2–7.  Here, they have gathered facts and

researched legal theories related to this class action and have developed and maintained this

litigation since its filing.  *Id.* ¶ 8.  The Court thus finds by a preponderance of the evidence that

the adequacy requirement is satisfied.

### C.  Rule 23(b)

Vazquez Perez must also establish that certification is appropriate for one of the reasons

set forth in Rule 23(b).  Here, he seek certification under Rule 23(b)(2), which authorizes class

certification if "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Courts in this District

routinely grant class action status under Rule 23(b)(2) in cases "alleging systemic administrative

failures of government entities."  *Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602,

628 (S.D.N.Y. 2010) (collecting cases), *aff'd in part, vacated in part on other grounds sub nom.*

*Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012).  Indeed, "class certification under Rule 23(b)(2)

is particularly appropriate in civil rights litigation[s]," such as this one.  *Brooklyn Ctr.*, 290

F.R.D. at 420 (quoting *Stinson v. City of New York*, 282 F.R.D. 360, 379 (S.D.N.Y. 2012).

Because Vazquez Perez has alleged that ICE policies and practices result in injuries that generally apply to the proposed class as a whole, and because Vazquez Perez seeks injunctive and declaratory relief that would benefit the proposed class as a whole, Rule 23(b)(2) is satisfied here. *See Abdi*, 323 F.R.D. at 144.

Vazquez Perez has satisfied the requirements of Rules 23(a) and (b). Furthermore, proposed class counsel satisfy the requirements of Rule 23(g) for the reasons articulated above. Accordingly, Vazquez Perez's unopposed motion for class certification is hereby granted and the New York Civil Liberties Union, the Bronx Defenders, and the Immigration Justice Clinic at Cardozo School of Law are appointed class counsel.

## IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

Having certified the class identified above, the Court turns to the parties' cross-motions for summary judgment.

### A.  Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is warranted, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and alterations omitted). There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). If the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted to the moving

party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

It is generally "the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted).  However, when the burden of proof at trial would fall on the non-moving party, the moving party may meet its burden by "point[ing] to a lack of evidence . . . on an essential element" of the non-moving party's claim.  *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  To survive a summary judgment motion, the non-moving party must then "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).  In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (internal quotation marks and citation omitted).

Where, as here, the Court considers cross-motions for summary judgment, it "must evaluate each party's motion on its own . . . taking care . . . to draw all reasonable inferences against the party whose motion is under consideration."  *Coutard v. Municipal Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017).

## B.  Procedural Due Process Claim

The Court first considers class members' procedural due process claim.  It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'"  *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  "The fundamental requirement of due process is the opportunity to be heard 'at a

*meaningful time* and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Here, the Government does not contest that the Due Process Clause demands that class members receive *prompt* initial master calendar hearings. *See* Dkt. No. 96 at 54:9–20.  However, the parties disagree as to what constitutes a prompt hearing under these circumstances.  Whether the procedures provided by the Government here comport with the Due Process Clause is assessed under the test set out in *Mathews v. Eldridge*, which requires the Court to balance "three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

### 1.  Private Interest

With respect to the first *Mathews* factor, Vazquez Perez argues that class members are denied "prompt access"—defined as within 7 or 10 days of arrest if the detainee has not waived the 10-day waiting period—to the "existing statutory protections against unnecessary and unlawful detention," and, as a result, have been unlawfully deprived of their physical liberty. Dkt. No. 51 at 16.  The Supreme Court has emphasized that "[f]reedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Here, numerous considerations bear on the immense importance of the private interest— freedom from imprisonment—at stake.  First, class members' detention is *civil* in nature.  The Supreme Court "has repeatedly reaffirmed that 'civil commitment *for any purpose* constitutes a

significant deprivation of liberty that requires due process protection.'" *Linares Martinez v. Decker*, No. 18-CV-6527 (JMF), 2018 WL 5023946, at *2 (S.D.N.Y. Oct. 17, 2018) (emphasis added) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)).  Second, class members are being detained by the Government in criminal jails operated by the states of New York and New Jersey pursuant to a contract with ICE to house immigration detainees.  Dkt. No. 59-1 ¶ 8. Vazquez Perez presents evidence that conditions of confinement in these jails are harsh, *see* Dkt. No. 59-1 ¶ 8; Dkt. No. 59-1 ¶ 13; Dkt. No. 59-5 ¶¶ 9–10; Dkt. No. 59-6 ¶ 9; Dkt. No. 59-17 ¶ 28; Dkt. No. 59-8 ¶¶ 28–31, and the medical and mental health care provided is woefully inadequate, *see, e.g.*, Dkt. No. 59-10 ¶¶ 6–8, 10–12, 15–26, 29; Dkt. No. 59-5 ¶¶ 9–13, 18–20; Dkt. No. 59-2 ¶¶17–38.  Yet, civil detainees are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).  Third, extended deprivation of detainees' physical liberty also places financial burdens on detainees and their families due to lost income, *see, e.g.*, Dkt. No. 59-16 ¶¶ 9–11, and has a profound effect on families, especially the children of detainees, *see, e.g., id.* ¶¶ 9–14.

Contrary to the Government's contention, the fact that the INA *authorizes* the detention of immigrants while their removal proceedings are pending, *see* 8 U.S.C. §1226, does not negate class members' interests—of the utmost importance—in freedom from imprisonment.  Class members may not have a "fundamental right to be released during removal proceedings," Dkt. No. 71 at 26, but nor does the Government have an unfettered right to detain them.  Indeed, even *statutorily-authorized* detention may amount to an *unconstitutional* deprivation of due process under certain circumstances.  *See, e.g., Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that petitioner's continued detention without

a bond hearing pursuant to § 1226(c) was unreasonable and unconstitutional under the circumstances); *see also Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218, 1239 (S.D. Cal. 2019) ("Congress's recognized constitutional authority to authorize detention of noncitizens during removal proceedings does not shield such authority from the limitations that the Due Process Clause commands to protect that interest.").

In light of the paramount importance of the private interest at stake, and the numerous considerations that bear on the importance of that right in this case, the Court concludes that the first *Mathews* factor weights in favor of Vazquez Perez.

### 2.   Risk of Erroneous Deprivation and Value of Additional Procedures

With respect to the second *Mathews* factor, the Court must consider (1) "the risk of an erroneous deprivation" of class members' significant interest in freedom from imprisonment "through the procedures used,"  and (2) "the probable value, if any, of additional or substitute procedural safeguards."  *Mathews*, 424 U.S. at 335.

### a.   Risk of Erroneous Deprivation

Vazquez Perez points to several ways in which the delay between arrest and initial master calendar hearing—and all of the opportunities and procedural protections such a hearing affords, *see* Dkt. No. 124 at 3–4—increases the risk that class members will be erroneously deprived of their significant interest in freedom from imprisonment.  For example, the initial master calendar hearing presents the first opportunity for a *meaningful* bond determination.  Indeed, though ICE makes an initial custody determination, these determinations are perfunctory; the Government does not contest that the New York Field Office has in effect adopted a no-bond policy, having issued bonds in 0% of cases in which individuals are detained pursuant to 8 § U.S.C. 1226 since 2016.  Dkt. No. 53-7 ¶ 9; Dkt. No. 53-1 ¶ 14.

24

While the Government is correct that custody determinations made by Immigration

Judges are discretionary, "the Supreme Court has recognized only two valid purposes for civil

detention [in the immigration context]: to mitigate the risks of danger to the community and to

prevent flight." *Lopez v. Sessions*, No. 18-CV-4189 (RWS), 2018 WL 2932726, at *10

(S.D.N.Y. June 12, 2018). Accordingly, where an individual is neither a danger to the

community nor a flight risk, her detention serves no purpose, and she is likely to be released on

bond following a meaningful custody determination by an Immigration Judge. *Cf. Krimstock v.*

*Kelly* (*Krimstock I*), 306 F.3d 40, 44 (2d Cir. 2002) (explaining that a seizure is not "justified" if

"less drastic measures than deprivation *pendente lite* are available and appropriate" to satisfy the

government's legitimate interest.). The greater the delay between arrest and a meaningful

custody determination—which is not available until the initial master calendar hearing—the

greater the risk of "erroneous deprivation" of these individuals' significant interests in their

physical liberty.

Similarly, for the number of detainees who will ultimately have their cases terminated

based on a finding by an IJ that they are not removable, the initial master calendar hearing

presents the first opportunity to move to terminate removal proceedings, Dkt. No. 53-1 ¶ 26; Dkt.

No. 53-3 ¶ 26. For these individuals, too, the delay between arrest and initial master calendar

hearing thus increases the risk of erroneous deprivations of physical liberty.

### b. Value of the Proposed Safeguard

Having identified the risk of erroneous deprivation, the Court turns to "the probable

value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. On

the record before the Court, the value of the proposed safeguard Vazquez Perez seeks—an initial

master calendar hearing within 7 or 10 days of arrest if the detainee has not waived the 10-day

waiting period— is clear.  Indeed, it is undisputed that 30–40% of detainees will be released on

bond after a meaningful bond determination before an Immigration Judge.  *See* Dkt. No. 59-1 ¶

19; Dkt. No. 59-7 ¶¶ 10–13.  And, though the parties present different calculations, a not

insignificant number of detainees will be found not removable after presentment to an

Immigration Judge.  *Compare* Dkt. No. 59-7 ¶¶ 2, 14–16 (finding that 9% of detainees will have

their case terminated by an Immigration Judge because they are not removable) *with* Dkt. No.

Dkt. No. 67 ¶ 13 n.1 (finding that 31 removal cases were terminated by an Immigration Judge in

2018).  For these individuals—who Vazquez Perez has established are being detained in criminal

jails under harsh conditions, *see supra* Section IV.B.1—prompter access to an initial master

calendar hearing would thus afford them an earlier opportunity to win their release.

The Government argues that the second *Mathews* factor weights in its favor because the

procedures already in place are sufficient to reduce the risk of erroneous detention.  Specifically,

it argues that there are already a number of procedural safeguards that "ensure fundamental

fairness to aliens detained for immigration purposes," Dkt. No. 71 at 27, including the

requirement that ICE make an initial custody determination within 48 hours of arrest and the

availability, at a detainee's request, of an expedited custody status hearing before an Immigration

Judge, *id.* at 28.  However, on the record now before the Court, this argument rings hollow

because the Government *does not* contest the ample evidence proffered by Vazquez Perez

establishing that these safeguards are, in fact, illusory.  *See* Dkt. No. 59-7 ¶ 9; Dkt. No. 59-1 ¶ 14

(ICE has denied bond in every case in which individuals are detained pursuant to 8 § U.S.C.

1226 since 2016); *see also* Dkt. No. 59-1 ¶¶ 21, 24; Dkt. No. 59-3 ¶ 19 (requests for an

immediate hearing and for IJ review of ICE's custody determination are ignored).

The Government also argues that Petitioners cannot demonstrate that the proposed safeguard is of any value where the Government is *already* providing initial master calendar hearings "roughly two weeks" after filing of the NTA and has committed to providing such hearings within 17 days after filing of the NTA. *See* Dkt. No. 135 at 6–8. In the year prior to the COVID-19 pandemic, median wait times between filing of the NTA and initial master calendar hearing ranged between 8 and 18 days, and the time between arrest and filing of the NTA hovered around 2–3 days. *See supra* Section I.B. The Government suggest that the difference between these numbers and Vazquez Perez's proposed safeguard—which would provide detained individuals with initial master calendar hearings within 7 or 10 days of arrest if the detainee has not waived the 10-day waiting period—is insignificant for purposes of the due process analysis. The Court disagrees.

Though the difference between the Government's policy and practice and Vazquez Perez's proposed safeguard may be relatively small and thus may lend the impression that the safeguard Vazquez Perez seeks is accordingly of little value, any such impression is false—especially where, as here, physical liberty is at stake. In cases in which the deprivation of real property is at issue—an interest far less weighty than the deprivation of physical liberty—courts have consistently required "prompt post-deprivation hearings," defined by the Second Circuit, in the case of seized automobiles, as *10 days* after receipt of a hearing request. *See, e.g.*, *Krimstock v. Kelly* (*Krimstock I*), 306 F.3d 40, 67 (2d Cir. 2002) (Sotomayor, J.) (finding, in a case involving the seizure of automobiles from individuals arrested for driving under the influence, that due process required "that plaintiffs be afforded a prompt post-seizure, pre-judgment hearing before a neutral judicial or administrative officer"); *see Jones v. Kelly (Krimstock II)*, 378 F.3d

198, 204 (2d Cir. 2004) (affirming the district court's order, on remand, requiring that such hearings be provided within *10 days* of receipt of a written demand).

And "elsewhere in the civil commitment context"—where the deprivation of physical *liberty* is at stake—"there is a long history of courts which have found that due process requires" an even more "expeditious hearing, often defined as a period of *no longer than seven days*." *Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218, 1240–41 (S.D. Cal. 2019) (finding that plaintiff-petitioners stated a procedural due process claim where wait times before initial master calendar hearings ranged from one to three months) (citation omitted); *see Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017) (requiring that noncitizen minors arrested on allegations of gang activity must be provided with a hearing before an Immigration Judge within seven days of arrest), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). "Expeditious" hearings held within seven days are often required in this context because when an initial hearing does not "occur close enough in time to the [individual's] arrest," an individual whose detention is not "reasonably related to a legitimate government purpose" may remain in Government custody unnecessarily and unjustifiably. *Id.* at 1199.

Yet from September 2019 to March 2020, median wait times between filing of the NTA and initial master calendar hearing were consistently between 13–14 days, *see supra* Section I.B—three to four days longer than the 10-day period of time that typically satisfies due process where the deprivation of real property is at issue and nearly *twice as long* as the seven-day period of time that typically satisfies due process where the deprivation of physical liberty is at stake. (These numbers are even longer when the two to three days between arrest and filing of the NTA is accounted for. *See supra* Section I.B.)  In light of the foregoing, the value of the additional safeguard Vazquez Perez seeks—which would afford unjustifiably detained individuals a *much*

28

earlier opportunity to win their release —is indisputably significant for purposes of the due process analysis.

Because Vazquez Perez has established that there is a risk of erroneous deprivation of class members' significant interest in freedom from imprisonment "through the procedures used" by the Government, and the value of his proposed safeguard is significant, the Court concludes that the second *Mathews* factor also weighs in his favor.

### 3.  Government Interest

The final *Mathews* factor requires the Court to assess "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Government argues that its "interest in the existing process is extensive . . . , as is the potential for significant fiscal and administrative burdens from any forced additional process." Dkt. No. 71 at 29. It specifically asserts that a "judicially imposed timeframe" for initial master calendar hearings would "create a deleterious ripple effect throughout the removal process," because "meeting a judicially-imposed deadline for all initial master calendar hearings may ultimately impede immigration judges' ability to provide prompt hearings (including subsequent master calendar and merits hearings) for other detained aliens." Dkt. No. 71 at 29.

While the Court is sensitive to the Government's concerns regarding the burden Vazquez Perez's proposed safeguard would place on the Immigration Courts, the Government offers scant evidence in the record to support these concerns. *See* Dkt. No. 67 ¶¶ 35, 46. And, in fact, the evidence before the Court on summary judgment contradicts the Government's assertions. As the data discussed above demonstrates, the Government successfully reduced wait times for a substantial proportion of detained individuals to 10 days or less following filing of the NTA in

six separate months, *see* Dkt. No. 130-1 ¶ 8 (June, July, August, and September 2019); Dkt. No.

155-2 ¶ 5 (June 2020); Dkt. No. 156-2 ¶ 4 (July 2020); Dkt. No. 159-2 ¶ 8 (October 2020), and it

offers no evidence that these reductions resulted in the feared ripple effects in any of these

months.

Furthermore, because Vazquez Perez does not seek to *add* to the "existing process," but

rather requests only prompt provision of procedural protections *already* guaranteed by the

statutory scheme, any burden on the existing process should be relatively small.  *See Coleman v.

Frantz*, 754 F.2d 719, 724 (7th Cir. 1985) ("Where first appearances are provided, the

requirement that they be timely would place a relatively small burden on law enforcement and

judicial officers."); *cf. Aguilar v. U.S. Immigration & Customs Enf't Chicago Field Office*, 346

F. Supp. 3d 1174, 1192 (N.D. Ill. 2018) (finding that "additional procedures" *not already*

provided for by the statutory scheme "would certainly burden ICE").  Accordingly, in the

absence of record evidence supporting the burdens the Government claims, the Court finds that

the final *Mathews* factor also weighs in Vazquez Perez's favor.

### 4.  **Balancing the *Mathews* Factors**

Balancing the *Mathews* factors, all of which weigh in favor of Vazquez Perez and against

the Government, the Court concludes, on the record before it on summary judgment, that the

demands of the Due Process Clause are not satisfied by the Government's current procedures.

In so concluding, the Court is mindful of the fact that since this motion was filed, this

country has been forced to confront a global pandemic of unprecedented proportions.  But while

COVID-19 undoubtedly must be factored into the Court's *Mathews* balancing, doing so does not

alter the Court's conclusion.  With respect to the first *Mathews* factor, the COVID-19 pandemic

only strengths class members' personal interests in freedom from imprisonment because, as

numerous courts across the country have recognized, "being in immigration detention places [detainees] at significantly higher risk of contracting COVID-19." *See United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (collecting cases). And where there is the possibility, under current circumstances, that a deprivation of liberty could result in a deprivation of *life*, the interest in liberty is only magnified.

With respect to the second *Mathews* factor, while the risk of erroneous deprivation may remain the same, the value of Vazquez Perez's proposed safeguard is much greater—especially in light of the fact that class members are being detained at criminal jails under harsh conditions and with inadequate access to medical care. As this Court and others have noted, "[i]ndividuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases," *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020), and thus each day, perhaps each hour, that elapses "threatens incarcerated [individuals] with greater peril." *United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1673244, at *3 (S.D.N.Y. Apr. 6, 2020). Thus, against the backdrop of the COVID-19 pandemic, the value of the prompt initial master calendar hearing Vazquez Perez seeks—which presents the first meaningful opportunity for unjustifiably detained individuals to challenge their detention—is cast into even sharper relief.

Finally, with respect to the third *Mathews* factor, COVID-19 may increase the potential for significant fiscal and administrative burdens to result from Vazquez Perez' proposed safeguard, as the pandemic itself has placed significant burdens on the Immigration Courts. However, to the extent the Government has been significantly burdened by the COVID-19 pandemic, that burden appears to have diminished with time. Indeed, despite significant delays in April and May, in June and July median wait times between filing of the NTA and initial

master calendar hearing were 8 and 10 days respectively.  *See* Dkt. No. 155-2 ¶ 4; Dkt. No. 156-2 ¶ 5.  And the Government has represented to the Court that the Varick Street Immigration Court believes it will be able to meet its 17-day time frame in cases going forward.  *See* Dkt. No. 154-2 ¶ 7.  Thus, because the Government has successfully reduced median wait times between filing of the NTA and initial master calendar hearing to pre-COVID levels and does not expect COVID-19 to affect its ability to meet its self-imposed 17-day time frame going forward, accounting for COVID-19 does not materially alter the Court's conclusion that the third *Mathews* factor weighs in favor of Vazquez Perez.

Because the first and second *Mathews* factors weigh more heavily in favor of Vazquez Perez in light of the COVID-19 pandemic, and the third factor may have once but no longer weighs more heavily in favor of the Government, the Court concludes that, even taking account of the COVID-19 global health crisis, its *Mathews* balancing dictates that the demands of the Due Process Clause are not satisfied by the Government's current procedures.

In determining what process is due class members, the Court is guided by the case law discussed above requiring prompt post-deprivation hearings where the deprivation of property or liberty is at stake.  The Court agrees with those courts that have found that, in the context of civil detention, the Due Process Clause requires an "expeditious hearing, often defined as a period of no longer than seven days."  *Cancino Castellar*, 388 F. Supp. 3d at 1241; *see Saravia*, 280 F. Supp. 3d at 1177.  The Court thus takes seven days as its starting point but does not treat this period as a strict constitutional requirement.  Due process is, after all "flexible," calling "for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  The "timing and nature of the required hearing will depend on appropriate

accommodation of the competing interests involved." *Krimstock I*, 306 F.3d at 51 (quoting

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)).

Here, the Court concludes that, on the record now before it and as a matter of law, due

process requires a prompt initial master calendar hearing to be held within 10 days of arrest.

This 10-day period takes account of the fact that the Immigration Court does not obtain

jurisdiction over removal proceedings until the NTA is filed, and the NTA is not typically filed

until two to three days after arrest—a period of time the Court finds reasonable.  Accordingly,

requiring initial master calendar hearings within 10 days of arrest ensures that, in the average

case, a detainee will receive an initial master calendar hearing within approximately seven days

of the *filing of the NTA.  Cf. Krimstock II*, 78 F.3d at 204 (affirming procedures requiring hearing

with 10 days of *receipt* of hearing request by NYPD).  A 10-day period also allows for the lapse

of the statutory 10-day waiting period in every instance, *see* 8 U.S.C. § 1229(b)(1), thereby

providing a more administrable requirement than Vazquez Perez's bifurcated proposal.  For

these reasons, the Court concludes that a 10-day requirement ensures that detainees are provided

an opportunity "to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews*, 424

U.S. at 335 (quoting *Armstrong*, 380 U.S. at 552), while accommodating the "competing

interests involved," *Krimstock I*, 306 F.3d at 51 (quoting *Logan*, 455 U.S. at 434).

### C.  Substantive Due Process Claim

The Court turns next to Vazquez Perez's substantive due process claim.  The Due Process

Clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or

property, without due process of law. . . ."  U.S. Const. amend. V; *Zadvydas*, 533 U.S. at 693.

These protections apply "to all 'persons' within the United States, including aliens, whether their

presence here is lawful, unlawful, temporary, or permanent," and they apply to immigration

detention as much as criminal detention. *Zadvydas*, 533 U.S. at 693; *see also Doherty v. Thornburgh*, 943 F.2d 204, 208 (2d Cir. 1991) ("The term used to define those entitled to protection under the due process clause, *i.e.,* 'person,' does not differentiate between citizens and non-citizens, but is broad and inclusive.").

"'[T]he touchstone of due process is protection of the individual against arbitrary action of government,' . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citations omitted). The Supreme Court has explained that "'[s]ubstantive due process' analysis must begin with a careful description of the asserted right," counseling that "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

Vazquez Perez frames the asserted right in familiar terms. He argues that extended pre-proceeding detention violates substantive due process on the basis that "[d]etention for several months prior to [the initial appearance for an individualized custody determination] is not tied to any legitimate government interest."[4] Dkt. 51 at 25. Contrary to the Government's argument, *see* Dkt. No. 71 at 33–34, there is little question that prolonged detention at some point violates the right to due process. In *Zadvydas*, for instance, the Supreme Court concluded that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem" under the Fifth Amendment. 533 U.S. at 690; *see also Young v. Aviles*, 99 F. Supp. 3d 443, 455

---

[4] The Government contends, meanwhile, that Vazquez Perez asserts a substantive due process right "to prompt presentment" in the civil immigration context, akin to that which exists in criminal proceedings. Dkt. No. 71 at 33; *see also* Dkt. No. 135 at 10–11. Because Vazquez Perez disputes this characterization, *see* Dkt. No. 75 at 10–11, the Court focuses on the substantive due process claim that Vazquez Perez does assert.

(S.D.N.Y. 2015) ("[T]his Court agrees with those that have found that, at some point, detention without a hearing offends the Due Process Clause."). Indeed, even *Carlson v. Landon*, on which the Government relies in arguing that substantive due process is not implicated in this case, upheld temporary detention of an alien during deportation proceedings only after noting that the "problem of . . . unusual delay" was not present. *Carlson*, 342 U.S. 524, 545–46 (1952). The question, then, is not whether Vazquez Perez has invoked a sufficiently established right in making his substantive due process claim. He has. Rather, the question before the Court is whether the detention at issue here is sufficiently prolonged as to violate the right to due process.

There is no bright-line rule to determine at what point detention has become sufficiently prolonged as to violate substantive due process principles. Reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case. *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 234 (3d Cir. 2011), *overruled on other grounds by Jennings v. Rodriguez*, 138 S.Ct. 830 (2018). Instead, the touchstone is the reasonableness of the length of detention. In the context of 8 U.S.C. § 1226(c), for instance, this Court observed that "whether mandatory detention under § 1226(c) has become 'unreasonable,'[] and thus a due process violation, must be decided using an as-applied, fact-based analysis." *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *10 (S.D.N.Y. May 23, 2018) (citing *Demore*, 538 U.S. at 532 (Kennedy, J., concurring)). Vazquez Perez cites a number of criminal cases that found that prolonged detention prior to an initial proceeding ran afoul of the Due Process Clause—which found violations of substantive due process after delays of eighteen and thirty-eight days, respectively, without an initial appearance before a judge or a magistrate. *See* Dkt. No. 51 at 25–26 (citing *Coleman v. Frantz*, 754 F.2d 719, 723 (7th Cir. 1985); *Hayes v. Faulkner Cty.*, 388 F.3d 669, 675 (8th Cir. 2004)). And he cites *Armstrong v. Squadrito*, 152 F.3d 564

(7th Cir. 1998), in which the Seventh Circuit held that a pre-proceeding detention lasting fifty-seven days violated substantive due process. *Squadrito*, 152 F.3d at 569. As the Government indicates in its briefing, however, the criminal context raises unique circumstances that bear on the reasonableness of the length of detention. Dkt. No. 71 at 31–32. And *Squadrito* is difficult to square with the present context because the court's analysis was at least in part guided by the fact that the state law permitted "punish[ment]" by imprisonment for violation of the civil law, which state courts had previously identified as requiring the kinds of due process protections ordinarily associated with criminal proceedings. *See Squadrito*, 152 F.3d at 574–76; *see also* Dkt. No. 71 at 32.

Other cases provide some guidance that bear more directly on the immigration context. In the post-removal-period detention context, for instance, the Supreme Court identified six months of detention as presumptively reasonable. *Zadvydas*, 533 U.S. at 701. Other courts, also in that context, have similarly adopted five-to-six months as a useful touchstone, if not a brightline rule. *See Sajous*, 2018 WL 2357266, at *10 (collecting cases); *Lopez v. Sessions*, No. 18-CV-4189 (RWS), 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018) ("[C]ourts in this Circuit have generally been skeptical of prolonged detention of removable immigrants, without process, lasting over six months."). As noted above, however, the delays at issue in this litigation do not approximate six months. Cognizant of the proposition that "[s]ubstantive due process is an outer limit on the legitimacy of governmental action," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), and unconvinced that any of the relevant precedent in the immigration context supports Vazquez Perez's reasoning that substantive due process is

implicated here, the Court cannot conclude, on this record, that the delays violate substantive due process.[5]

### D.  APA Claim

Finally, the Court turns to Vazquez Perez's APA claim.  Vazquez Perez contends that the wait times violate the APA, which requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  They also point to 5 U.S.C. § 706(1), which allows courts to "compel agency action unlawfully withheld or unreasonably delayed."  The Government contends that after this Court's September 30 Opinion & Order, which found that the habeas statute precluded classwide injunctive relief, such relief is not available pursuant to the APA, and that as a threshold matter Vazquez Perez's claim thus fails. *See* Dkt. No. 135 at 13.

In arguing as much, the Government relies on the text of the APA's waiver of sovereign immunity, which provides that sovereign immunity is not waived under the APA "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" by the plaintiff.  5 U.S.C. § 702.  As the Supreme Court has observed, "[t]hat provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  Application of that principle looks to the nature of the other statute and the relief a plaintiff seeks; "[w]hen a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit."  *Id.* at 216 (citation and internal quotation marks omitted).  The inquiry is by necessity context-specific, not lending itself to

---

[5] The Court does not mean to suggest that any detention shorter than six months is constitutionally acceptable.  In light of the as-applied, fact-based analysis that substantive due process calls for, *see Sajous*, 2018 WL 2357266, at *10, there may be circumstances in which shorter periods of detention—even significantly shorter periods of detention—may violate substantive due process.

generalization or abstraction.  To make such a determination, the Court must analyze closely whether the claims made under the APA in fact parallel the precise limitations contained in the other statute.  *See id.*

The Court agrees with the Government that the similarities in Vazquez Perez's pursuit of classwide injunctive relief under the habeas statute and his APA claim for injunctive relief are so similar as to bar injunctive relief under the APA.  Both claims seek the same redress: an order from the Court compelling the agency to hold initial master calendar hearings within a more reasonable time period.  While Vazquez Perez's articulation of his APA claim does not use identical language, and instead rests on the language of 5 U.S.C. § 706(1), the differences are too tenuous to find any meaningful distinction.  As a result, to allow the class to pursue injunctive relief under the APA after finding that 8 U.S.C. § 1252(f) bars classwide injunctive relief would engender the kind of circumvention that the operative exception in 5 U.S.C. § 702 seeks to avoid. Vazquez Perez does not address this point in his briefs; in his only brief filed after the Court's September 30 Order, he notes that he intended to "rest[] upon the [APA] . . . arguments set forth in prior briefs."  Dkt. No. 133 at 5.  But neither his December 5, 2018 brief, Dkt. No. 51, nor his February 7, 2019 reply brief, Dkt. No. 75, address the issue of availability of relief under the APA where § 1252(f) bars classwide injunctive relief.  Accordingly, relief pursuant to the APA is denied.

## V.   CONCLUSION

Vazquez Perez has satisfied the requirements of Rules 23(a) and (b), and thus certification of a class is appropriate here.  Accordingly, the Court GRANTS Vazquez Perez's unopposed class certification motion and certifies the Rule 23(b)(2) class comprised of all individuals who have been, or will be, arrested by ICE's New York Field Office and detained

under Section 1226 of Title 8 of the United States Code for removal proceedings before an

Immigration Judge and who have not been provided an initial hearing before an Immigration

Judge.

Vazquez Perez's motion for summary judgment is GRANTED IN PART and DENIED

IN PART.  The Court DECLARES that the Due Process Clause of the Fifth Amendment requires

that initial master calendar hearings for any class member be held within 10 days of an

individual's arrest by ICE.

The Government's cross-motion for summary judgment is GRANTED as to the

substantive due process and Administrative Procedure Act claims.

This resolves Dkt. No. 132.  The Clerk of Court is respectfully directed to enter judgment

and close this case.

SO ORDERED.

Dated: November 30, 2020
          New York, New York

_____
          ALISON J. NATHAN
          United States District Judge